# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**MEGAN JO KURTTI,**

    **Plaintiff,**

    **v.**                                   **Case No. 18-CV-873**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

    **Defendant.**

---

## DECISION AND ORDER

---

Megan Jo Kurtti seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). For the reasons stated below, the Commissioner's decision is affirmed.

## BACKGROUND

Kurtti filed an application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income alleging disability beginning on August 15, 2013 due to depression, fibromyalgia, migraines (TMJ), learning disability, and allergies. (Tr. 268.) The claim was denied initially and on reconsideration. A hearing was held before an Administrative Law Judge ("ALJ") on February 1, 2017. (Tr. 40–79.) Kurtti testified at the hearing, as did Thomas Heiman, a vocational expert ("VE"), and Kurtti's mother, Brenda Kurtti. (Tr. 40.)

In a written decision issued April 11, 2017, the ALJ found that Kurtti had the severe impairments of borderline intellectual functioning, depression, hearing loss, fibromyalgia, mild systemic lupus erythematosus, and obesity. (Tr. 16.) The ALJ found that Kurtti did not have an

impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 17–21.) The ALJ found Kurtti had the residual functional capacity ("RFC") to perform light work, with the following limitations:

> [N]o climbing ladders, ropes, or scaffolds; never work at unprotected heights or around dangerous moving machinery; able to her and understand simple, oral instructions, but she should work in an environment with no more than moderate noise intensity; understand, remember, and perform simple, routine, repetitive tasks; a low stress job, defined as one that requires only occasional work-related decisions and involves only occasional changes in the work setting; should not be required to perform at a production rate pace (such as assembly line work); occasionally able to interact with supervisors and co-workers, but should never be required to perform tandem tasks that require coordination with co-workers; and limited to brief and superficial interaction with the public.

(Tr. 22.) The ALJ found Kurtti was unable to perform any of her past relevant work. However, given her age, education, work experience, and RFC, the ALJ found that other jobs existed in significant numbers in the national economy that Kurtti could perform. (Tr. 30–32.) As such, the ALJ found Kurtti was not disabled from August 15, 2013 through the date of the decision (April 14, 2017). (Tr. 32.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied the plaintiff's request for review. (Tr. 1–5.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails

to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2.    *Application to this Case*

Kurtti alleges the ALJ erred in her determination of Kurtti's RFC with regard to both her mental health impairments and her physical impairments. She further argues the ALJ erred in her consideration of Kurtti's subjective complaints. I will address each argument in turn.

### 2.1    RFC—Physical Impairments

Regarding her physical impairments, Kurtti argues the ALJ failed to give proper weight to the opinion of state agency reviewing physician Dr. Mina Khorshidi, who opined that Kurtti should avoid all exposure to pulmonary irritants due to her allergies. RFC is the most the claimant can do in a work setting "despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000–01; *see also* 20 C.F.R. § 404.1545(a)(1); SSR 96–8p. The Administration must consider all of the claimant's known, medically determinable impairments when assessing RFC. 20 C.F.R. § 404.1545(a)(2), (e). An ALJ

must consider all medical opinions in the record, but the method of evaluation varies depending on the source. The opinion of a state agency reviewing physician, unlike that of a treating source, is not entitled to any special weight.

The ALJ considered Dr. Khorshidi's opinion regarding exposure to pulmonary irritants, but accorded that portion of her opinion little weight. (Tr. 27.) The ALJ noted that Dr. Khorshidi's limitation was based on Kurtti's chronic allergic rhinitis/sinusitis. (*Id.*) The ALJ found, however, that Kurtti's allergies did not cause any significant functional limitations. Specifically, the ALJ noted that while Kurtti treated at the Allergy and Immunology Clinic and in December 2013 stated that she thought her allergy symptoms had worsened, she had not had any allergy shots for approximately one year. (Tr. 16–17.) The ALJ further found that a spirometry study conducted in December 2013 showed only mild obstruction and subsequent treatment records showed no significant complaints of or treatment for allergies. (Tr. 17.) In January 2015, Kurtti told her primary care provider that despite some complaints of increased fatigue, her health had improved tremendously in the past year. (*Id.*) Further, Kurtti testified that she had no respiratory limitations. (Tr. 27.) Thus, the ALJ found Kurtti's allergies non-severe (Tr. 17) and because they did not cause any significant functional limitations, no associated limitations were warranted in the RFC (Tr. 27).

Kurtti argues the ALJ erred in rejecting Dr. Khorshidi's opinion because she improperly substituted her own lay opinion for that of Dr. Khorshidi's. (Pl.'s Br. at 15, Docket # 10.) Kurtti further argues that the ALJ was not qualified to decide, contrary to the state agency reviewing physician's opinion, that Kurtti's respiratory impairment was not severe. (*Id.* at 16.) Kurtti essentially argues that an ALJ, as a lay person, is unqualified to determine whether a claimant's medically

determinable impairment is severe, or at least cannot do so if the ALJ's finding is contrary to a state agency physician's opinion. (*See id.*)

This is incorrect. It is precisely the job of the ALJ to determine, at step two of the five-step sequential evaluation of disability, whether a claimant has a medically determinable impairment that is "severe." (Tr. 14, citing 20 C.F.R. § 404.1520.) Thus, an ALJ, despite being a lay person, is "qualified" to make that determination. And an ALJ is not required to blindly accept any medical opinion, whether it be that of a state agency physician or a treating physician. Even the opinion of a treating physician, which is accorded special weight, can be rejected by the ALJ if the opinion is not well-supported or is inconsistent with the record and the ALJ gives good reasons for rejecting the opinion. 20 C.F.R. § 404.1527(c)(2) and SSR 96-2p.

The question is whether the ALJ applied the correct legal standards and supported her decision with substantial evidence, which she did here. The ALJ explained, in detail, why she concluded that Kurtti's allergies were not severe (Tr. 17) and caused her no significant functional limitations, thus not warranting a limitation in the RFC (Tr. 27). The ALJ explained that Dr. Khorshidi's opinion as to pulmonary irritants was based on her allergies, and given her finding that Kurtti's allergies caused her no significant functional limitations, the opinion was accorded little weight. (Tr. 27.) Kurtti does not point to any evidence the ALJ failed to consider that would undermine her conclusion that Kurtti's allergies caused her no significant functional limitations. For these reasons, the ALJ did not err by rejecting Dr. Khorshidi's opinion regarding pulmonary irritants.

### 2.2    RFC—Mental Health Impairments

Regarding her RFC for her mental health impairments, Kurtti argues the ALJ failed to properly weigh the opinions of two state agency reviewing psychologists, Dr. Kyla King and Dr. Russell Phillips. Kurtti further argues the ALJ failed to properly weigh the opinion of Dr. Karin

Suesser, who performed a neuropsychological evaluation of Kurtti. Kurtti also argues the ALJ failed to indicate how she determined that Kurtti was moderately limited in social functioning and erred in assessing Kurtti's time off-task.

The ALJ accorded some weight to both Dr. King's and Dr. Phillips' opinions, finding that while their assessments were generally supported by the objective evidence, including the evidence submitted after their assessments, both reviewing psychologists failed to adequately consider Kurtti's intellectual deficits and the combined effects of Kurtti's depression and intellectual deficits on her ability to interact with others. (Tr. 28.) The ALJ explained that this was why she limited Kurtti to simple, routine, and repetitive tasks in a low-stress environment with no production rate pace work and limited her to occasional interaction with supervisors and co-workers, no tandem tasks with co-workers, and brief and superficial interaction with the public. (*Id.*)

Despite the fact the ALJ offered greater restrictions then those opined by Drs. King and Phillips, Kurtti argues the ALJ erred in the weight given to the opinions. She does not articulate, however, how the ALJ erred in weighing Dr. King's opinion. Regarding Dr. Phillips' opinion, Kurtti argues the ALJ mischaracterized the opinion because Dr. Phillips opined Kurtti was markedly limited in the ability to understand and remember detailed instructions and in the ability to carry out detailed instructions. (Pl.'s Br. at 8.) Kurtti argues the ALJ omitted this limitation from her hypothetical questions to the VE. (Pl.'s Reply Br. at 5, Docket # 18.) But Dr. Phillips also opined that while Kurtti may be markedly limited in the ability to understand and remember detailed instructions, she could understand and reliably recall simple information. (Tr. 140.) The ALJ adopted this portion of Dr. Phillips' opinion, as seen by the RFC limitations to simple, oral instructions, and simple, routine, and repetitive tasks. The VE testified based on these limitations that there were jobs in significant numbers Kurtti could perform, such as housekeeping cleaner. (Tr. 73–74.) The ALJ's

bridge between the evidence and the ALJ's conclusion is both logical and clear. The ALJ did not err in this regard.

Dr. Suesser performed a neuropsychological evaluation of Kurtti at the request of Kurtti's treating psychiatric provider, Lindsay Davel, NP. (Tr. 1643.) Davel sought to clarify Kurtti's diagnosis and generate appropriate treatment recommendations. (*Id.*) Dr. Suesser originally met with Kurtti on June 23, 2015 (Tr. 1643–49) and performed testing on Kurtti on July 13, 2015 (Tr. 1661–62) and July 28, 2015 (Tr. 1683–84). Dr. Suesser met with Kurtti on September 8, 2015 to provide the results of her testing (Tr. 1721–22) and also generated a written report (Tr. 3039–48). Dr. Suesser found that Kurtti showed a pattern of borderline intellectual functioning, difficulties with processing speed and working memory, a significant pattern of reading disorder (dyslexia), as well as some mild symptoms of ADHD, characterized mainly by problems with emotional and behavioral self-control. (Tr. 1721.) Dr. Suesser opined that Kurtti would need frequent repetition of new information to learn; would need more immediate and frequent feedback, more frequent prompts and reminders, and reduced distractions; would require use of simple language; and should ideally work with someone who can observe her daily behaviors. (Tr. 3047–48.)

The ALJ accorded Dr. Suesser's opinion some weight, finding that her opinion that Kurtti would have difficulties in several areas was supported in part by the cognitive and intelligence testing performed during the evaluation; however, the ALJ accorded it little weight to the extent the opinion was inconsistent with the RFC. (Tr. 29.) The ALJ found the record evidence supported the conclusion that Kurtti was capable of performing the range of simple tasks as articulated in the RFC as her mental health progress notes showed a good response to treatment and relatively normal cognitive functioning. (*Id.*) The ALJ also pointed to Kurtti's ability to live independently in an

apartment and work several jobs, one of which was near substantial gainful activity level and was semi-skilled, and the fact she volunteered on a regular basis. (*Id.*)

Kurtti argues the ALJ erred by failing to call a medical expert to testify regarding the evaluation and failing to address any specific limitations from the evaluation. (Pl.'s Br. at 12–13.) Kurtti also argues the ALJ limited Kurtti to occasional interaction with supervisors, despite Dr. Suesser opining Kurtti needed immediate, frequent, and detailed feedback from supervisors (suggesting she would require additional interaction with supervisors) and found Kurtti could perform work that involved occasional changes in work setting despite Dr. Suesser finding Kurtti had problems with any kind of change in routine. (Pl.'s Reply Br. at 4.)

Again, Dr. Suesser found that Kurtti showed a pattern of borderline intellectual functioning, difficulties with processing speed and working memory, a significant pattern of reading disorder (dyslexia), as well as some mild symptoms of ADHD, characterized mainly by problems with emotional and behavioral self-control. (Tr. 1721.) The ALJ agreed Kurtti had borderline intellectual functioning and explained that she limited Kurtti to simple, routine, and repetitive tasks in a low-stress environment with no production rate pace to account for her intellectual deficits. (Tr. 28.) The ALJ also explained that the limitation to occasional interaction with supervisors accounted for the effects of Kurtti's depression and intellectual deficits on her ability to interact with others. (*Id.*) Dr. Suesser opined Kurtti would perform better in situations where there is clear structure and routine (Tr. 3039), which is consistent with the RFC limitation to simple, routine, and repetitive tasks in a low-stress environment. Although Dr. Suesser opined Kurtti would need a great deal of concentration even for simple tasks (Tr. 3046), she did not opine Kurtti was unable to perform simple tasks.

The crux of Kurtti's fault with the ALJ's rejection of Dr. Suesser's opinion regards the limitation to occasional interaction with supervisors despite Dr. Suesser's finding that Kurtti would need frequent feedback from supervisors and the occasional changes in work setting despite Dr. Suesser finding Kurtti had problems with any changes in routine. But the ALJ correctly found that Kurtti's treatment records, activities of daily living, and work history cut against Dr. Suesser's limitations. (Tr. 29.) Kurtti saw Dr. Suesser four times in 2015. In contrast, Kurtti treated with Renee Slusarski, LCSW for her mental health issues on a near-monthly basis (often multiple times per month) between 2013 and 2016. After losing her job at Goodwill, Kurtti specifically told Slusarski that she was "going to look for something that is more independent, feeling that perhaps this might be a positive for her." (Tr. 1782.) Kurtti did indeed get a new job cleaning the next month and told Slusarski that she was "cleaning, independently at a school" and felt "like this [has] been a good fit for her and something that she [was] really pleased with" and stated that "working on her own will really help in dealing with things." (Tr. 1789.) Kurtti herself testified that she has difficulty interacting with people, including authority figures. (Tr. 54–55.) Again, the ALJ explained that the limitation to occasional interaction with supervisors accounted for the effects of Kurtti's depression and intellectual deficits on her ability to interact with others. Thus, the ALJ's limitation was well supported by the record.

Regarding Dr. Suesser's opinion that Kurtti could not tolerate any changes in routine, she found that Kurtti needed support and guidance in her daily activities and was unlikely to be able to function completely independently and responsibly. (Tr. 3047.) Dr. Suesser also opined Kurtti will need long-term planning for her future care because she is overly dependent on her parents. (Tr. 3046–47.) But this conclusion is also not supported by the record. Kurtti did live independently and both Davel and Slusarski (again, who treated Kurtti frequently and consistently), noted that Kurtti's

mental health symptoms were worse when her parents were around (Tr. 1010, 1050–51) and her symptoms greatly improved when she did not see her parents (Tr. 1051, 1377–78, 1402, 1459). In December 2014, Slusarski noted that Kurtti had not seen her parents "in some time" because she was working so much. (Tr. 1459.) Further, the record reflects Kurtti was caring for her mother, who suffered from multiple sclerosis. (Tr. 1420.) Thus, Dr. Suesser's opinion regarding Kurtti's level of dependence is belied by the record. It is unclear, then, how the ALJ's limitation to only occasional changes in work setting does not sufficiently account for her mental health limitations.

Kurtti also argues the ALJ failed to indicate how she determined Kurtti was moderately limited in social functioning, when Dr. Phillips opined she was only mildly limited in social functioning. Kurtti also seemingly argues that she is completely unable to sustain appropriate relationships with supervisors and co-workers at all, thus precluding work. (Pl.'s Reply at 9.) The ALJ very clearly explained why she found moderate limitations in social functioning (Tr. 18–19) and explained how she incorporated the limitation into the RFC (Tr. 28). Neither Dr. Phillips' mild limitation, nor Kurtti's argued extreme limitation, is supported by the record. Kurtti told Davel and Slusarski that she loved her job at Goodwill and was making friends there. (Tr. 1402, 1411, 1458.) Kurtti also stated that she had a lot of friends, especially from church, and enjoyed socializing. (Tr. 535.) She told Slursarski in February 2015 that she was socializing more, and went out with co-workers to celebrate her birthday. (Tr. 1562.) Yet, Kurtti clearly had conflict with various co-workers and was ultimately terminated from Goodwill for making a "rude" comment to a co-worker. (Tr. 1598, 1609, 1616.) Given the record evidence, the ALJ's finding of moderate limitations in social functioning is well supported.

Finally, Kurtti argues the ALJ erred in assessing Kurtti's time off-task. While Kurtti generally points to her testimony that she could stand for a hour and then needed to take a break (testimony

that is contradicted by record citations to Kurtti standing "a lot" at work (Tr. 1513)) and could only

pay attention for five minutes and could not watch an entire television show (despite Dr. Suesser and

Davel finding she has no significant problems with attention (Tr. 1052, 3039)), Kurtti offers no

evidence of a need to be off-task for any period of time. Kurtti relies on case law from various district

courts in this circuit that have found where an ALJ solicits VE testimony but proceeds to disregard

the testimony without explanation, it is grounds for remand. *See, e.g.*, *Hampton-Lewis v. Berryhill*, No.

2:17-CV-291, 2018 WL 6242463, at *7 (N.D. Ind. Nov. 29, 2018); *Diaz v. Berryhill*, No. 2:17-CV-314,

2018 WL 4627218, at *8 (N.D. Ind. Sept. 27, 2018); *Kukec v. Berryhill*, No. 16 CV 9805, 2017 WL

5191872, at *3 (N.D. Ill. Nov. 9, 2017); *Sayles v. Barnhart*, No. 00 C 7200, 2001 WL 1568850, at *9

(N.D. Ill. Dec. 7, 2001).

    These cases are distinguishable from Kurtti's case. In those cases, the ALJ's question to the

VE regarding time off-task was within a specific hypothetical addressing the claimant's other

limitations and was supported by the evidence. For example, in *Hampton-Lewis*, the ALJ asked the

VE to consider time off-task due to fatigue as a side effect of the claimant's medication. 2018 WL

6242463, at *7. Again, Kurtti points to no evidence of a need to be off-task for any specific period of

time. Furthermore, the ALJ's questions to the VE regarding time off-task and workplace absences

came as almost an afterthought following the usual hypothetical questions. The ALJ stated as

follows: "I just have two other questions for you. In your opinion, what is the customary employer

tolerance for time off task during the workday in additional to regular breaks?" The VE responded

"up to and including 5 percent of the work schedule." (Tr. 76.) The ALJ then asked the VE about

customary employer tolerances for absences per month, to which the VE responded one unscheduled

absence every other month up to six per year. (*Id.*) The ALJ did not incorporate those limitations into a hypothetical or elicit from the VE whether any jobs were available using those limitations.

While the ALJ's questions were unnecessary and create some confusion, they do not rise to the level of reversible error. Given the lack of evidence supporting a need to be off-task for any specific amount of time, coupled with the fact the questions were not incorporated into the hypotheticals to elicit any useful information (i.e., available jobs), any error by the ALJ in this regard was harmless. Thus, for all of these reasons, the ALJ did not err in assessing Kurtti's RFC as to her mental health impairments.

### 2.3    Assessment of Subjective Complaints

Finally, Kurtti argues the ALJ erred in assessing Kurtti's subjective complaints, specifically, the ALJ: relied on meaningless boilerplate, failed to evaluate whether Kurtti had good days and bad days, overly relied on her activities of daily living, and improperly rejected her mother, Brenda Kurtti's, statements.

The Commissioner's regulations set forth a two-step test for evaluating the credibility of a claimant's statements regarding her symptoms. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; the location, duration, frequency, and intensity of the symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any

-12-

medication the claimant takes; treatment, other than medication, used for relief of the symptoms; other measures the claimant uses to relieve the symptoms; and any other factors concerning the claimant's functional limitations due to the symptoms. *Id.*

The ALJ found that Kurtti's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the decision. (Tr. 23.) While Kurtti is correct that the Seventh Circuit has cautioned against the use of "meaningless boilerplate," *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), it is only grounds for remand when the boilerplate language "fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible," *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). Thus, use of boilerplate, in and of itself, does not warrant remand, and plaintiffs would be wise to forgo making this general argument in favor of specific arguments regarding how the ALJ erred.

Kurtti faults the ALJ for failing to evaluate whether she had "good and bad days." It is true that "[a] person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days." *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). But the concern is whether the ALJ focused solely on the claimant's "good" days, ignoring her "bad" days. *See id.* ("Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."). It is relevant that Kurtti worked throughout the relevant time period, and, as the ALJ noted, one job was near substantial gainful activity level. (Tr. 29.) In July 2013, Kurtti told Slusarski she was concerned

she was not getting enough hours at work (Tr. 601) and in February 2015, told Slusarski she had been working approximately thirty-six hours and felt that another couple of hours would not be that difficult on her (Tr. 1584). Kurtti also volunteered up to twenty hours per week at the Salvation Army. (Tr. 1821.)

Kurtti's argument focuses primarily on her testimony that she sometimes had difficulties interacting with people, had migraines once or twice a month, and had frequent jaw pain. (Pl.'s Br. at 17.) As articulated above, the record supports only moderate limitations in social interactions, which the ALJ properly accounted for in the RFC. Regarding migraine headaches and jaw pain from TMJ, the ALJ addressed these symptoms, noting Kurtti began treating for TMJ in January 2014 and returned to physical therapy in May 2016 after an exacerbation of TMJ symptoms. (Tr. 16.) The ALJ also noted, however, that each time she engaged in treatment she experienced positive results. (*Id.*) Specifically, Kurtti experienced relief from her jaw pain with the use of a splint (Tr. 996) and stated that she noticed a reduction in migraines by fifty percent since beginning physical therapy (Tr. 1478). In June 2016, she stated that she only had one severe migraine the previous month and her headache was less disruptive to her daily activities and her job. (Tr. 2491.) Thus, Kurtti has not shown how the ALJ erred in this regard.

Kurtti also argues the ALJ relied too heavily on her activities of daily living in finding her subjective complaints not credible. The ALJ found Kurtti's description of her daily activities inconsistent with her complaints of disabling symptoms and limitations, pointing specifically to the fact that despite saying she let her chores "pile up," she ultimately did live independently, with some financial help from her parents. (Tr. 26.) The ALJ also considered the fact Kurtti volunteered, cared for her mother with multiple sclerosis, worked, stated she believed she could work on a full-time basis, socialized, attended a conference to become a life coach, and exercised four days a week with

a personal trainer. (Tr. 26–27.) Kurtti argues her "activities of daily living [were] replete with restrictions and accommodations" that the ALJ failed to consider. (Pl.'s Br. at 18.) But the record does not support this. All of the activities the ALJ cites are accurate and cut against her allegations of disabling symptoms.

Kurtti relies primarily on her testimony, as well as her mother's testimony, that she relied heavily on her parents for daily assistance. (*Id.*) Brenda Kurtti testified that if she and her husband were not around, Kurtti would not be able to get by. (Tr. 67.) But the record does not reflect this level of dependence. Kurtti's mental health treatment records show she had a fairly tumultuous relationship with her parents and while she was working longer hours, she avoided seeing them. (Tr. 1377–78, 1402, 1459.) In December 2014, Kurtti told Slusarski that she had not gone to her parents' house "in some time" because she was working evenings. (Tr. 1459.) Also, Kurtti told Davel that she was helping care for her mother, who suffers from multiple sclerosis. (Tr. 1420.) And while Kurtti testified that she could not keep her living space clean (Tr. 57), Kurtti told Davel that she lived with a roommate for five months and kicked the roommate out for not helping Kurtti around the apartment, which suggests that Kurtti was doing the cleaning (Tr. 1625). For these reasons, the ALJ's reliance on Kurtti's activities of daily living in discounting her allegations of disabling symptoms was proper and supported by the record.

Finally, Kurtti argues the ALJ improperly rejected her mother's statements. The ALJ assigned little weight to Brenda Kurtti's statements regarding Kurtti's dependence on her parents because she is not medically trained to make exacting observations about dates, frequencies, types, and degrees of medical signs; because she is not a disinterested party (by virtue of their familial relationship); and "[m]ost importantly, significant weight cannot be given to the witness's assessment because it, like the claimant's, is simply not consistent with the preponderance of the opinions and observations by

-15-

medical doctors in this case." (Tr. 30.) Kurtti focuses primarily on the ALJ's first two rationales for discounting Brenda Kurtti's statements, arguing that Kurtti's mother was not making medical observations, but permissible lay observations. Kurtti further argues an ALJ must not automatically discount a family member's testimony because of bias. (Pl.'s Br. at 19–20.)

While I agree the ALJ's first two reasons for discounting the statements are not as strong, the ALJ's final reason, which she states was the most important reason for rejecting Brenda Kurtti's statements, is well supported by the record. Again, Brenda Kurtti paints a very different picture of her daughter's level of dependence than what is reflected in the record. Further, though bias is difficult to show, the records clearly reflects that Kurtti became very involved in her parents' marital strife, returning to therapy with Slusarski in August 2016 after being discharged for meeting her treatment goals solely because she was upset about her parents' marriage and was counseling her mother through the marital difficulties. (Tr. 1859–60.) Thus, the ALJ's conclusion that Brenda Kurtti's statements would be colored by her affection for Kurtti (Tr. 30) is particularly supported by this record. For all of these reasons, I find the ALJ did not err in evaluating Kurtti's subjective complaints.

## CONCLUSION

Kurtti argues the ALJ erred in determining her RFC and in considering her subjective complaints. I find the ALJ's decision is supported by substantial evidence. Therefore, the Commissioner's decision is affirmed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 27th day of February, 2019.

BY THE COURT:

_s/Nancy Joseph_____
NANCY JOSEPH
United States Magistrate Judge